First, Judge Booth found that the evidence was insufficient on our part to establish a trial issue on the question of pretext. His second point was that we failed to preserve the claim of failure to provide reasonable accommodation because the administrative charge before the EEOC was inadequate. And finally, he determined that even if the charge were adequate to show a claim of denial of reasonable accommodation, that the plaintiff never asked for reasonable accommodation. Just very quickly as background, my client was employed by a hospital as a patient transporter. That meant he took patients back and forth from room to room at the hospital. He was employed successfully for six years. He suffered from attention deficit disorder, depression, and obsessive compulsive disorder. Those disorders were known to the defendant employer. In fact, he had received intermittent FMLA leave to accommodate those disabilities prior to the time that he was discharged. His last performance review was done in April 2013, literally one year before he was fired. That performance review was outstanding, and we've set it forth actually in our brief in order for the court to understand how he was regarded as an employee. After that time, his supervisor, Laura Evitz, went to another position, and she was replaced by an individual named Patrick Isbell and another supervisor named Lisa Perotti. The plaintiff testified that upon their arrival, he began to experience adverse treatment. There were complaints about his forgetfulness. There were complaints that he was doing and needing to be prompted to do things, all things that he had done throughout the course of his work before but had been accommodated by his supervisor, Laura Embers. His new supervisors began making fun of his disability. One supervisor, when he tried to talk to him about the fact that he was having some difficulties because of his mental issues, said, I'll match your ADD for my ADD, and I'll win. And I don't care about it, and I don't want to talk to you about it. And then subsequently, he was given some write-ups for forgetfulness, a failure to remember to clock in, for example, or failing to remember a room number, and the fact that he'd gotten written down, and so he wasn't able to get those sorts of things right. Counsel, I want to ask you about the reasonable accommodation claim right off the bat, because some of the stuff you're getting at is tied to the discrimination claim, but some of it seems to be about the reasonable accommodation claim as well. The requirement is that the facts be in the charge, and my question to you is, was the reasonable accommodation claim adequately stated in the charge? I would say this. Yes, the words reasonable accommodation are contained in the charge. He said that he could perform his job with reasonable accommodation. That was in the body of the charge. I'd also point out that he complained about disability discrimination. 42 U.S.C. Section Zion 200112B5 defines disability discrimination, including a failure to reasonably accommodate. So by saying that he suffered from disability discrimination, he was really saying that in any number of ways that are included in the statute, including the fact that the failure to accommodate is in fact itself an act of disability discrimination. Well, even assuming that's true, one of the problems of having with the record in this case is it seems that at least below there's a different theory. The theory below was that the intake questionnaire provided the notice, not the charge. Could you address that? Yeah, I've abandoned that claim. Okay. I'm not making that claim, even though it was in the intake questionnaire. The question is, what from the charge would the EEOC reasonably investigate on the basis of that charge? And when somebody says in his charge, I could have done this job had I been given reasonable accommodation, I think that it's clear that a reasonable investigation on the part of the EEOC would have included investigation of the reasonable accommodation. But here's the problem I'm then having. So because the theory was different, it was about the intake questionnaire below, there were a couple of points, one in the district court brief, where it says in the brief, the charge of discrimination does not include any allegation about needing or requesting an accommodation. And then if you go to the hearing on the summary judgment motion, a similar statement was made. So it seems that there's a concession below that the charge didn't contain enough information about the reasonable accommodation claim. So I'm wondering if the argument you're making now is waived in light of the concessions made before the district court. I don't believe it is because I think we did make the argument forcefully that he checked the box and said, disability discrimination, which would include by definition a failure to reasonable accommodate, and he checked a box called other. And unlike the cases cited by the appellee in this case, there was no check of a second box. You understand there is no box to check for reasonable accommodation. There's just not a box that says that. And all of the cases that they cite are cases where sex discrimination has been charged, and the plaintiff later tries to bring up a case of race discrimination. I mean, these concepts are so inextricably intertwined that I don't think we waived it, first of all. And secondly, I think that this court can consider the issue and decide it on its merits. So should we ignore those statements that were made, or am I misconstruing the statements? I think you're misconstruing the statements to an extent. That wasn't the only argument that we made. Okay. All right. I'd like to go back to the pretext argument, if I might, but first let me talk about the circumstances of discharge. As I'm sure you're aware from having reviewed the papers below and the appendix, there was a celebrity that was admitted into the hospital at St. Luke's in April of 2014. Given my age, I know nothing about the talents of this particular celebrity or even what he or she does, but I understand it was widely publicized in the news, including the Kansas City newspaper, the local news, the day before this alleged incident involving Mr. Lindemann occurred. So this was hardly HIPAA-protected confidential information. Routinely in the news, people say so-and-so was shot and was taken to St. Margaret's Hospital. That's not hospital. The fact that a person is a patient in a hospital as a result of some widely publicized event is not disclosing confidential information. At least my client didn't believe it was. But assuming that's true and getting to sort of jumping ahead to the pretext argument, your client, at least the record suggests that your client, was told to stop at least twice, don't say anything, and continue to tell other folks. So even if it wasn't confidential, is there anyone else that you were able to identify who not only, because your allegation is that other people told about the celebrity or said things about the celebrity, but I didn't see anything in the record about anyone else who had said things about the celebrity and was told to stop and then continue to do it. Am I wrong about that? You are right about that. Okay. All right. But as I say, my client just didn't believe there was anything wrong with that because everyone it seemed in the city knew that that was the case and people were talking about it. Now with respect to pretext, you mentioned two other people were not disciplined. Mr. Lineman testified that he was told by an individual named Brandy Diaz in the emergency room that this particular individual was in the hospital. He told that to the people that were investigating it. In addition, in the notes written up in the investigation, the human resources representative wrote down an individual named Patty Ambrose, similarly situated to Mr. Lineman, also came up and blurted out that name in front of the people that were doing the investigation, and neither of them were disciplined. Now the district court said, well, they weren't fired, but that's not the point. They weren't even disciplined. We know from the disciplinary records that those two instances when people blurted out the name under the facts construed most favorably to the plaintiff were not even discharged, not reprimanded, not given an oral warning, nothing. Those actions were disregarded. Those people are similarly situated, we believe. Well, they didn't talk about it outside the institution. As far as we know. So why are they similarly situated? The district court's whole point, those people only blurted it out, as you put it, inside the hospital, whereas your guy was talking out around town. No, he wasn't talking around town. He was talking to his roommate and his friend from seventh grade, both of whom were helping him prepare. But they weren't in the hospital. They weren't hospital employees. That's correct, but he had a good reason for doing it. First of all, remember, this is widely being publicized. I'm not debating whether he had a good reason. I'm talking about whether he was similarly situated. Well, isn't an individual, particularly a person with mental disorders, entitled to enlist some assistance in defending himself against the discharge of a job that he's had for seven years, the source of his dignity? Can't he go to his roommate and his best friend and say, help me here? Is that really a violation of policy? I just don't think that that. You're saying he made the disclosures to them as part of after he was terminated? No, while he was writing his letter explaining why he shouldn't be terminated. They assisted him in writing a letter back to Human Resources explaining what he did and why he did it. It was written before he was terminated and while he was on suspension. So you're saying he was suspended before he made the disclosures outside the hospital? That's right. And then he. Based on doing what? Disclosing it within the hospital? Yes. And then he enlisted the assistance of his roommate. And this man needs help. He's not like most people. He's incapable of defending himself. And so he needed the assistance of these people who he trusted in order to make that point. Just to finish up on the pretext issue, because I see I'm really running out of time here. It's important to note that there was testimony that his supervisor, Patrick Isbell, had him and a couple of other employees on a list of individuals to get rid of. Now, did he say, I'm going to get rid of him because of his disability or age? No. But it shows that he was looking at him to get rid of him. That's an important factor that a fact finder, a jury, could consider in deciding whether this was a truthful reason or just an effort to fulfill a wish on his part to get rid of Mr. Lindeman. All right. Would you like to save any time for rebuttal or do you want to? Let me finish on pretext and I'll try to do something. Final thing, in the investigation, I know my time is short. Mr. Lindeman was discharged and the other two were not because they said he got his name, the celebrity's name from a whiteboard written in the emergency room. Did your alleged comparables have the disciplinary history that he had? He did not, but that's not my point. They weren't disciplined at all. Had they done something wrong under the disciplinary policy, they should have at least had a verbal warning. They had nothing. They weren't considered to be having violated the policy. But didn't the appellant have several distinct progressive disciplinary actions in his record? He did, but only from— Provided by the time card and call-in procedure? He did. Missing a shift? He did, but only from Mr. Isbell, not his prior supervisors, and only because of his disabilities, his forgetfulness, his failure to write things down. He did have, and we're contending that those were part of a plot to get rid of him. They didn't start writing him up until the very end. I wanted to talk about the whiteboard. They claimed he learned that from the whiteboard. There's a testimony from another person in the administration that said the celebrity's name would have never been on a whiteboard. He couldn't have gotten it there. I'd like to reserve 50 seconds. Very well. You may. Ms. Gonnerman, we'll hear from you. May it please the Court. Good morning. My name is Alyssa Gonnerman, and I'm here on behalf of Defendant St. Luke's. We're here to ask that you affirm the district court's finding of summary judgment on each and every one of Mr. Lindemann's claims. I first want to point out there are five key facts in this case. First, Mr. Lindemann admitted to the misconduct for which he was disciplined. Two, Mr. Lindemann never connected his misconduct with his alleged disability. Three, Mr. Lindemann did not need an accommodation. After St. Luke's addressed his misconduct, it did not recur. He could perform his job. Four, Mr. Lindemann shared confidential patient information in and outside of St. Luke's after twice being told to knock it off. He did not heed either one of those warnings. And five, Mr. Lindemann was at the final stage of discipline at the time that he breached St. Luke's policies. I first want to address Mr. Gallagher's confidential waiver argument. St. Luke's policies apply to its employees, not to its patients. The VIP patient, if it was her prerogative to go out and publicize information, she could do so. But as an employee, Mr. Lindemann cannot do so. And Mr. Lindemann's argument that he didn't think he violated the policies is irrelevant. Instead, the relevant inquiry is whether St. Luke's reasonably believed he violated the policies to warrant termination. It did then, and it still does today. It has not wavered from that belief. First, in addressing Mr. Lindemann's wrongful discharge claim, his seven breaches occurring in and outside of St. Luke's established he violated St. Luke's privacy policies. This court has held time and time again that violating company policies is a legitimate, non-discriminatory reason for acting. The burden is then on Mr. Lindemann to establish pretexts, which he tries but fails to do. He attempts to do so by looking at Ms. Diaz and Ms. Ambrose. However, he does not pass the similarly situated analysis test. To do so, to pass that rigorous test, he must establish both of those employees are similarly situated, are employees not in the same protected class, and are engaged in the same offense and in all relevant respects. Importantly, he bears the burden. St. Luke's bears no burden to establish dissimilarity at all. Is it a problem under that particular line of analysis that the other two employees who released the celebrity patient's name, the VIP patient's name, received no discipline at all, whereas he received, obviously, a much greater discipline? No, because they did not engage in the same offense. He doesn't even pass that first prompt. There is certainly a chasm between excitedly saying one time internally, guess who's here, and stating the VIP patient's name. That's certainly different from what Mr. Lindemann did, where he made seven breaches. Five of those were internally and two externally. Six of those seven breaches occurred after Ms. Mogg told him, knock it off, stop talking about the patient, yet he ignored it. Then Ms. Perotti told him, knock it off, stop talking about it, and yet he continued to do so. Moreover, the scope of the breach was different. Mr. Lindemann not only said the name of the patient and the fact of hospitalization, but he also shared his understanding of the diagnosis of that patient, which broadens the scope of that breach. Each one of those facts establishes that his conduct escalated above and beyond what he claims Ms. Ambrose and what Ms. Diaz did, therefore establishing, in fact, they were not engaged in the same offense. This court has held just as much in the Ward decision. In that decision, there were two employees who were engaged in one physical fight with another. This court found that the employees' actions toward one another were objectively different conduct because each had escalated at different points during that same fight. That's exactly what happened here. Beyond the same offense prong, we don't even know if Ms. Ambrose or Ms. Diaz are outside of the protected status. For all we know, they could have a condition rendering them disabled, and we don't know their age as well either. Mr. Lindemann has also not presented any of the other factors that this court considers in the rigorous similarly analysis test. Namely, he hasn't established that they have the same supervisor as him, that they have similar work histories or their disciplinary records. He has not established that they were two at the last stage of discipline as Mr. Lindemann was, and we also don't know about their tenors. For those reasons, he cannot use Ms. Diaz or Ms. Ambrose as comparators in order to establish pretext, and we ask that this court affirm the district court's ruling on that wrongful discharge claim. Next, turning to Mr. Lindemann's accommodation claim, we don't think that is properly before this or any court because he failed to exhaust his administrative remedies. An accommodation claim has been found to be a separate and discreet act of discrimination requiring its own administrative exhaustion. This court held so much that accommodation is a separate form of discrimination under the Rehab Act and its Pebbles versus Potter decision. This court has also held that cases interpreting the ADA and Rehab Act are interchangeable because they rely on the same basic standards and definitions. And moreover, Mr. Lindemann admitted that his charge does not include allegations regarding a request for any accommodation. That dooms its claim itself. And finally, turning to the accommodation claim itself, Mr. Lindemann made an untimely request for accommodation, and what he now seeks is to have his discipline rescinded. That is unreasonable as a matter of law. First and foremost, mere knowledge of a disability is not enough. There's a predicate requirement triggering the interactive process of an employee's request for accommodation. What Mr. Lindemann seeks here is to have his discipline removed, but having a disability does not excuse past misconduct. The EEOC guidance says just as much. Stating the ADA does not protect an employee from the consequences of violating conduct requirements, even where the conduct is caused by the disability. It goes on to further state that an accommodation must be requested prospectively by stating the timing of a request for reasonable accommodation is important because an employer does not have to rescind discipline, including termination. This court agrees. It agreed in the Hill v. Kansas City decision and also in the Schaefhauser v. United Parcel Services, a case where it held that liability is not established when an employee engages in misconduct, learns of an impending adverse employment action, and then informs the employer of disability that is the supposed cause of prior misconduct and request an accommodation. And that is exactly what we have here with Mr. Lindemann. And finally, I'll just briefly touch on Mr. Lindemann's AIDS discrimination claim. We don't think that's properly before this court because he didn't preserve it for purposes of appeal. He still had a duty of establishing pretext, and that was not briefed in his opening argument. And this court has held in the Carragher v. Target Corporation decision and Fair v. Norris that when a party fails to brief an issue in their opening brief, they have abandoned that claim. The district court also properly concluded that the plaintiff failed to offer any evidence that the confidentiality violation was any result of his age. And there's similarly been no evidence under the similarly situated analysis as to any other employee's age. The bottom line is that Judge Boot got it right in granting motion for summary judgment on all claims because there is no triable issue. We ask that you affirm the grant of summary judgment on each of Mr. Lindemann's claims. Thank you. Very well. Thank you for your argument. And I think there is a little time remaining there. Fifty-one seconds. Yeah. You may use it, Mr. Connolly. Thank you. With respect to the AIDS discrimination claim, it's important to note that in the motion for summary judgment, the defendant conceded that the plaintiff could make a crime-faced case of AIDS race discrimination and only attack the issue of pretext. So pretext goes to both issues. And the final point I want to make with respect to the request for accommodation, the record is replete with instances where Mr. Lindemann testified that he told his supervisor, Mr. Isbell, that he was having trouble doing the job and it was because of his disability. The case of Taylor v. Phoenixville in the Third Circuit, Lewis Garden v. Asko in the Fifth Circuit, both stand for the proposition that the imposition of the burden of requesting accommodation is diminished when you're dealing with a person with diminished capacity, as this court noted in dicta in the case of Ballard, which is cited in our brief, which recognizes the same principle, noting in that case that the plaintiff was a sophisticated IRS agent and knew how to ask for accommodation, but the case would be difficult with a person with disabilities. Thank you very much, Your Honors. Very well. Thank you both for your arguments. The case is submitted and the court will file an opinion in due course. You may be excused.